*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re HENRY/ROBERTS, Minors.

UNPUBLISHED
August 20, 2019

No. 346855; 346857; 346859
Wayne Circuit Court
Family Division
LC No. 14-518274-NA

Before: BECKERING, P.J., and SAWYER and CAMERON, JJ.

PER CURIAM.

In these consolidated appeals,[1] in Docket No. 346855, respondent-father Morgan appeals as of right the trial court's order terminating his parental rights to JMR under MCL 712A.19b(3)(c)(*i*) (182 or more days have elapsed since issuance of an initial dispositional order, conditions that led to adjudication continue to exist, and no reasonable likelihood conditions will be rectified within a reasonable time), (g) (parent failed to provide proper care or custody and no reasonable expectation parent will provide proper care or custody within a reasonable time),[2] and (j) (reasonable likelihood child will be harmed if returned home). In Docket No. 346857, the trial court terminated respondent-mother's parental rights to JMH, JMR, JVR, AKLR, and ASJR under MCL 712A.19b(3)(c)(*i*), (g), and (j). Lastly, in Docket No. 346859, the trial court terminated respondent-father Maxwell's parental rights to JVR, AKLR, and ASJR under MCL 712A.19b(3)(c)(*i*), (g), and (j).[3] We affirm.

---

[1] *In re Henry/Roberts Minors*, unpublished order of the Court of Appeals, entered December 26, 2018 (Docket Nos. 346855, 346857, and 346859).

[2] MCL 712A.19b(3)(g) was amended effective June 12, 2018.

[3] The trial court also terminated the parental rights of JMH's father in this case, but he has not appealed that order and is not a party to this appeal.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

JMH, JMR, JVR, and AKLR were taken into the care of the Department of Health and Human Services (DHHS) in November 2014. Respondent-mother did not have appropriate housing or a legal income, was struggling with substance abuse, and had left her four children with their maternal great-aunt. Respondent-mother pleaded to facts establishing jurisdiction in December 2014, and she was ordered to engage in and benefit from individual counseling, substance abuse counseling, family therapy, and parenting classes. She was also required to participate in weekly, random drug screens, to visit with the children regularly, and to obtain and maintain suitable housing and a legal income. Although he received notice, respondent-father Morgan, who is JMR's father, did not attend the proceedings. The trial court adjudicated him and established jurisdiction on the basis of testimony by the CPS worker who authored the petition and stated that respondent-father Morgan did not visit or support JMR. Respondent-father Maxwell, who was then only the putative father of JVR and AKLR, also did not come to court despite sufficient notice.

In June 2015, respondent-mother gave birth to ASJR. Respondent-mother admitted to using cocaine, marijuana, and alcohol while pregnant with ASJR, and when born, ASJR tested positive for marijuana and cocaine. The trial court exercised jurisdiction over ASJR on the basis of those facts. Respondent-father Morgan responded to the proceedings at that same time, and he was given a minimal treatment plan by DHHS so that he could reunite with JMR. The trial court ordered him to establish regular visitation with JMR, to obtain suitable housing and a legal income, and to maintain contact with the DHHS worker. Respondent-father Maxwell came forward in March 2016 and established legal parentage over JVR, AKLR, and ASJR, and pleaded facts establishing jurisdiction. Respondent-father Maxwell was given an identical treatment plan as respondent-mother.

During the proceedings, beginning in June 2017, the trial court considered guardianships for all of the children. The process was delayed by the lack of a trial court order, but ultimately, the guardianship office determined that none of the children were eligible for guardianship. DHHS then petitioned the trial court to terminate respondents' parental rights, citing that none of the parents had complied with their treatment plans over the significant history of the case. After a termination hearing, the trial court agreed and terminated respondents' parental rights to their respective children. This appeal followed.

## II. REASONABLE EFFORTS FOR REUNIFICATION

Respondent-mother and respondent-father Morgan argue that DHHS did not comply with its statutory responsibility to make reasonable efforts to reunify a family before seeking termination. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Respondent-father Morgan did not preserve this issue on appeal because he did not "object or indicate that the services provided to [him] were somehow inadequate," at the time "the court adopt[ed] a service plan . . . ." *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012) (quotation marks and citation omitted). Respondent-mother, on the other hand, preserved

this issue because she objected to DHHS's alleged failure to re-refer her to parenting classes and family therapy when the guardianship process was no longer viable. However, respondent-mother's remaining arguments are unpreserved because she did not raise them in the trial court. *Id*.

For preserved issues, we review for clear error a trial court's decision regarding whether "reasonable efforts were made to preserve and reunify the family." *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A trial court clearly errs when "we are definitely and firmly convinced that it made a mistake." *In re White*, 303 Mich App 701, 709-710; 846 NW2d 61 (2014). Unpreserved errors, however, are reviewed for plain error affecting respondents' substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008).

## B. APPLICABLE LAW

"Under Michigan's Probate Code, [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown Minors*, 500 Mich 79, 85; 893 NW2d 637 (2017). "As part of these reasonable efforts, [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86, citing MCL 712A.18f(3)(d). "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App at 248. In addition to participating in the service plan, respondents must also "demonstrate that they sufficiently benefited from the services provided." *Id*.

## C. RESPONDENT-FATHER MORGAN

First, we address respondent-father Morgan's apparent argument that he was improperly adjudicated because he was not present at his adjudication trial and the trial court did not specify a statutory ground establishing jurisdiction. In addition to that argument lacking merit, it is also waived because respondent-father Morgan "failed to properly present [the] issue in his statement of questions presented." *In re BKD*, 246 Mich App 212, 218; 631 NW2d 353 (2001). Even if we were to consider this argument, it lacks legal and factual support. We have reviewed the entire record and are satisfied that respondent-father Morgan was provided "notice reasonably calculated, under all the circumstances, to apprise" him of the pending adjudication, thereby satisfying his right to procedural due process. *In re Rood*, 483 Mich 73, 92; 763 NW2d 587 (2009) (quotation marks and citation omitted). His decision to avoid the trial and not present a defense was his own. Moreover, the trial court properly determined, on the basis of the evidence admitted at the adjudication trial, that jurisdiction was appropriate because of respondent-father Morgan's failure to provide proper care and custody of JMR, and his abandonment of her to the care of her maternal great-aunt. MCL 712A.2(b)(1).

Next, we consider respondent-father Morgan's arguments that pertain to whether DHHS made reasonable efforts to reunify him with JMR. His initial argument is that DHHS failed to make a service plan for him. Respondent-father Morgan is correct that DHHS is required to create such a plan, *In re Hicks/Brown*, 500 Mich at 85-86, citing MCL 712A.18f(3)(d), but he is incorrect that DHHS failed to do so in this case. Respondent-father Morgan confuses a minimal service plan with the lack of a service plan. The service plan in this case required that respondent-father Morgan visit JMR regularly, remain in contact with DHHS, and provide proof of income and stable housing. In his brief on appeal, respondent-father Morgan argues that he was never provided with "parenting classes, visiting schedule, counseling referrals, [or] parent partner referrals . . . ."

Respondent-father Morgan is correct that such services were not offered, but that is only because DHHS and the trial court were not concerned about respondent-father Morgan's parenting *ability*, but rather there was concern regarding whether he would actually be involved in JMR's life and be able to support her. This was a well-founded concern because respondent-father Morgan could not, or refused to, establish a stable income and living situation and regularly visit JMR. Respondent-father Morgan does not suggest how the proposed services would have benefited him with respect to his requirements under the service plan. With the exception of a "visiting schedule," none of the proposed services are related to assisting respondent-father Morgan with his service plan. Moreover, respondent-father Morgan never requested a visiting schedule, and the maternal great-aunt stated on the record that she had been open to respondent-father Morgan visiting whenever he was available, so long as he called ahead of time. Thus, although a visiting schedule was not needed, it was also not requested. Moreover, the lack of a set schedule likely benefitted respondent-father Morgan when he moved out-of-state, allowing for more flexibility with visits when he was in town. Providing services that are unrelated to a respondent's barriers to reunification is not part of DHHS's statutorily required "reasonable efforts" to reunify a family. *In re Hicks/Brown*, 500 Mich at 85-86, citing MCL 712A.18f(3)(d). Thus, this argument is without merit.

Respondent-father Morgan next argues that DHHS failed to make reasonable efforts at reunification because it considered granting guardianship over the children. Respondent-father Morgan specifically cites DHHS's alleged failure to "properly process paperwork for a court ordered permanency plan of guardianship" and "follow through with the alternative plan to return [JMR] to [respondent-father] Morgan" in South Carolina. Respondent-father Morgan alleges that, had DHHS properly filed the paperwork for a guardianship, his rights would not have been terminated. The record, however, does not support that allegation. It is true that DHHS and the trial court considered a plan where the maternal great-aunt would be named the guardian of JMR, which would allow respondent-father Morgan to stay involved in her life, and that there was a delay in the guardianship paperwork. However, the paperwork delay did not affect the outcome of the guardianship process. DHHS policy did not allow for a guardianship where a relative—here, the maternal great-aunt—was willing to adopt. As is clear from the record, the maternal great-aunt was ready and willing to adopt all of the children, including JMR, from the early stages of the case. Thus, even if the paperwork had been submitted in a timely manner, the guardianship still would have been denied. Furthermore, respondent-father Morgan was alerted as early as August 10, 2017, that the permanency plan for JMR was reunification with him, not guardianship. The termination hearing did not occur until October 31, 2018— more than one year later. In other words, even given the delayed paperwork, respondent-father

Morgan had more than one year after the potential for a guardianship ended to show DHHS that he visited JMR regularly, was able to stay in contact with DHHS, and had established both a stable living situation and income. It was his failure to do those things that ultimately led to termination of his parental rights. Consequently, there is no evidence on the record that a delay in the guardianship paperwork was a failure to make reasonable efforts by DHHS. *In re Hicks/Brown*, 500 Mich at 85-86.

Lastly, respondent-father Morgan suggests that DHHS somehow committed error by failing to follow through with the plan to return JMR to his care in South Carolina. Respondent-father Morgan's argument, however, fails to address that DHHS specifically *did* try to place JMR with him, but he was unable to show even a minimum level of consistency in visitation with JMR, and he failed to prove that he had established stable housing and income. Indeed, at the time of the termination hearing, respondent-father Morgan was no longer living with his wife in South Carolina, admittedly did not have a job, and presented inconsistent and confusing testimony regarding his future housing plans. Thus, it was not DHHS's alleged failure to place JMR with respondent-father Morgan that led to termination of his parental rights, it was his failure to show to the trial court that he engaged in the service plan and benefited from it. *In re Frey*, 297 Mich App at 248.

In sum, respondent-father Morgan's plan for reunification was minimal, and it was respondent-father Morgan's own shortfalls that led to him failing to accomplish and benefit from that treatment plan. The efforts of DHHS were reasonable and unrelated to respondent-father Morgan's failure to participate in and benefit from his treatment plan. *Id*.

## D. RESPONDENT-MOTHER

Respondent-mother also argues that DHHS failed to fulfill its statutory obligation to exercise reasonable efforts at reunification. Although not acknowledged by respondent-mother, she was provided a significant number of services by DHHS: individual counseling, substance abuse counseling, family therapy, parenting classes, housing assistance, and regular visits with her children. Respondent-mother first argues that she was substantially compliant with her treatment plan throughout the proceedings. This argument is irrelevant to whether DHHS made reasonable efforts at reunification and is therefore addressed later in this opinion as it relates to whether termination was proper. We first address respondent-mother's argument that, because DHHS failed to re-refer her to parenting classes and family therapy, it failed to provide her with the statutorily required reasonable efforts at reunification. This argument fails.

Respondent-mother ignores the record in this case because DHHS referred her to parenting classes five different times before she actually completed the course. And then, when she did complete the course, she did not benefit from it, as evidenced by her physically and verbally abusive behavior, refusal to adopt new disciplinary techniques, and failure to attend regular visitation with the children. The same is true for the family therapy. DHHS referred respondent-mother to family therapy with her children on multiple occasions, all of which were terminated early because respondent-mother refused to attend. Unlike the parenting classes, respondent-mother never actually completed family therapy, and thus, could not have benefited from DHHS's repeated offers of family therapy. DHHS is required to make reasonable efforts at reunification, and it did so in this case by offering respondent-mother five different sets of

parenting classes and by making multiple re-referrals to family therapy. *In re Hicks/Brown*, 500 Mich at 85-86. Respondent-mother was required to participate in those services—which she did do after five referrals for parenting classes, four of which ended in early termination for lack of attendance, but did not do for family therapy despite multiple referrals—and to benefit from them—which she did not do. *In re Frey*, 297 Mich App at 248.

Respondent-mother argues, however, that she should have been re-referred to those services one final time as the case came to a close. However, she was re-referred to family therapy late in the proceedings. Because DHHS did not believe that respondent-mother would benefit from repeating the same parenting classes, it chose to pursue a parent partner for respondent-mother. When respondent-mother did not qualify for a parent partner, DHHS focused on providing a parenting coach for her. But according to the testimony of a foster care worker, the parenting coach and family therapy never occurred because of scheduling conflicts, and, although the record does not identify who had the scheduling conflict, it ultimately does not matter. Respondent-mother's verbal threats, inappropriate physical discipline, and refusal to be redirected away from those behaviors—even after completing parenting classes—resulting in a loss of visitation, was not a failure by DHHS to make reasonable efforts at reunification. *In re Hicks/Brown*, 500 Mich at 85-86. Rather, it was respondent-mother's failure to comply with and benefit from the services offered. *In re Frey*, 297 Mich App at 248. Thus, this argument is without merit.

Lastly, respondent-mother argues that she should have been provided additional time to show that she could benefit from services after the trial court changed the permanency plan from guardianship back to reunification. The permanency plan was changed to guardianship in June 2017. Although the trial court did not enter an order officially changing the plan back to reunification until April 2018, a foster care worker testified that she had informed respondent-mother in November 2017 that guardianships were no longer an option. The foster care worker also testified that it was always expressed to the parents that the guardianships had never been confirmed, and that the parents were still required to comply with and show benefit from their service plans. Despite that, respondent-mother now appears to argue that so long as the plan remained to grant guardianships over the children, she was not required to abide by the service plan. This is not true, however, because a parent whose child has a guardian can still have their parental rights terminated. See, e.g., MCL 712A.19b(3)(d)-(f). Moreover, respondent-mother *was* provided additional time to come into compliance with her service plan after the permanency plan changed. Indeed, she was provided at least six months, and at most one year, to show improvement. Instead, respondent-mother's compliance with her treatment plan worsened—she did not visit the children as often as she had initially, she had her visitation revoked, she skipped a significant number of drug screens, she lived in housing that was too small for her children, and she refused to provide proof of income beyond February 2018. Once again, DHHS's efforts at reunification were reasonable, but respondent-mother simply did not participate in and benefit from the services offered. *In re Frey*, 297 Mich App at 248.

### III. STATUTORY GROUNDS FOR TERMINATION

All three respondents argue that the trial court clearly erred in finding that clear and convincing evidence supported statutory grounds to terminate their parental rights to their respective children. We disagree.[4]

#### A. STANDARD OF REVIEW AND GENERAL LAW

"This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App at 709. A trial court's findings of fact are clearly erroneous if "we are definitely and firmly convinced that it made a mistake." *Id*. at 709-710. " 'To terminate parental rights, a trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence.' " *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 635; 853 NW2d 459 (2014), quoting *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

#### B. TERMINATION UNDER SUBSECTION (c)(*i*)

The first ground relied upon by the trial court, MCL 712A.19b(3)(c)(*i*), states that a parent's rights may be terminated if "182 or more days have elapsed since the issuance of an initial dispositional order" and "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

Here, the "initial dispositional order" for respondent-mother was issued in 2014, for respondent-father Morgan in 2015, and for respondent-father Maxwell in 2016. All of respondents' parental rights were terminated on November 1, 2018. Thus, more than 182 days had passed since the initial dispositional orders, fulfilling the first requirement of MCL 712A.19b(3)(c)(*i*) for all three parents.

The next step in the analysis requires consideration of whether "[t]he conditions that led to the adjudication continue[d] to exist" at the time of termination. MCL 712A.19b(3)(c)(*i*). "This statutory ground exists when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services . . . ." *In re White*, 303 Mich App at 710 (quotation marks omitted). Participation in and completion of certain portions of a service plan is not enough where a parent "fail[s] to demonstrate sufficient compliance with or benefit from those services specifically targeted to address the primary basis for the adjudication in th[e] matter[.]" *In re Frey*, 297 Mich App at 248.

---

[4] Because the trial court relied on the former version of MCL 712A.19b(3)(g), despite it being amended effective June 12, 2018, we will not address that statutory ground on appeal. Any error was entirely harmless because termination was proper under subsections (c)(*i*) and (j), and only one statutory ground for termination is necessary. *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 635; 853 NW2d 459 (2014).

## 1. RESPONDENT-FATHER MORGAN

With regard to respondent-father Morgan, JMR was brought into foster care because of respondent-father Morgan's failure to visit and provide for her, and his abandonment of her to her maternal great-aunt, for more than one year. To remedy those problems, respondent-father Morgan was ordered to visit JMR regularly, stay in contact with the caseworker, and to obtain, maintain, and prove that he had secured appropriate housing and a legal income. Respondent-father Morgan's visitation with JMR was inconsistent throughout the proceedings. Although there were periods of time when respondent-father Morgan was visiting JMR regularly and contacting her by telephone, there were also long periods of time when he was absent from JMR's life. For example, at the September 2015 dispositional review hearing, testimony was presented that JMR had not seen or spoken to respondent-father Morgan in over 30 days, and during the November 2015 and April 2018 dispositional review hearings, testimony was presented establishing that respondent-father Morgan had not visited JMR in a span of several months. In addition to failing to visit JMR, respondent-father Morgan often misled the trial court and DHHS regarding his visits with JMR, stating that he spent many overnights with her. However, JMR alerted the various DHHS and foster care workers that she actually was spending almost all of her time with respondent-father Morgan's estranged wife. At the time of the termination hearing, respondent-father Morgan's issues with visiting JMR still existed—a foster care worker testified that he had not visited JMR regularly in the recent past. Respondent-father Morgan testified that he did visit JMR regularly, but he did not report his visits to DHHS or the trial court. The trial court, however, refused to credit that testimony because, since April 2018, respondent-father Morgan's visits were ordered to be supervised unless he received DHHS permission for unsupervised visits. Thus, respondent-father Morgan was either lying about his visits with JMR, or was disobeying the trial court's order. In either event, respondent-father Morgan's issues with visitation that led to JMR's removal still existed at the time of the termination hearing.

The other issue that led to JMR being brought into DHHS care was respondent-father Morgan's failure to support JMR and abandoning her to the care of the maternal great-aunt. To cure that issue, the trial court ordered respondent-father Morgan to establish, maintain, and prove suitable housing and a legal income. At the time of the hearing, respondent-father Morgan testified that he was not employed. He also provided confusing and contradictory testimony regarding his housing situation. Initially, he stated that, immediately after the termination hearing, he was going to look at an apartment in Detroit where he planned to live. Then he testified that, immediately after the hearing, he planned to take JMR and move back to South Carolina to live with his estranged wife in her home that had recently been inspected, but not yet approved, in anticipation of JMR possibly living there. Respondent-father Morgan also testified that he was living with his mother. A foster care worker testified that, since the inception of the case, respondent-father Morgan expressed his difficulties as to improving his housing situation and income. Therefore, at the time of termination, respondent-father Morgan did not have a legal income, did not provide clear testimony or proof of where he was living, and failed to give any assurance that he could provide a stable and appropriate home for JMR. Consequently, respondent-father Morgan's issues with housing and income that led to JMR being taken into care continued to exist at the time of termination. Thus, the trial court did not clearly err in finding that clear and convincing evidence supported that respondent-father Morgan's

"conditions that led to the adjudication continue[d] to exist" at the time of termination. MCL 712A.19b(3)(c)(*i*).

## 2. RESPONDENT-MOTHER

With respect to respondent-mother, the minor children were brought into DHHS care because of her issues with substance abuse, housing, income, and her general inability to care for the children. To remedy those problems, respondent-mother was ordered to participate and benefit from individual counseling, substance abuse counseling, family therapy, and parenting classes. She also was required to attend random weekly drug screens, to regularly visit the children, and to obtain and maintain suitable housing and a legal income. At the time of the hearing, respondent-mother was living in a home that was too small for her children and had not been approved by DHHS. She also had not provided proof of a legal income. While respondent-mother argues that she proved she was receiving disability payments from a car accident, the record establishes that her disability payments ended in February 2018, about eight months before the termination of her parental rights.

Respondent-mother participated in substance abuse counseling throughout the proceedings. However, she did not benefit from that counseling and still struggled with substance abuse at the time of termination. Specifically, respondent-mother missed 156 random drug screens throughout the case. Those missed screens count as positive for illicit drugs. When respondent-mother did attend screens, she almost always tested positive for marijuana, and often tested positive for cocaine. The last screen she attended, which was nearly seven months before termination, she tested positive for both marijuana and cocaine. Respondent-mother also admitted to using cocaine, marijuana, and alcohol while pregnant with ASJR, who tested positive for cocaine and marijuana at birth. Thus, given respondent-mother's long history of positive screens and missed tests, the record is clear that her substance abuse issues still existed at the time of termination and that she had not benefited from her substance abuse counseling.

Respondent-mother's issues with parenting also continued to exist at the time of termination. While she did complete parenting classes, respondent-mother did not benefit from those classes. At the time of the termination hearing, respondent-mother's visitation had been suspended after she had hit and pinched JMH as a form of punishment. Respondent-mother refused to acknowledge that such physical discipline was inappropriate. Although she stopped physically disciplining the children, she began using intimidation techniques with the children, wherein she would run up to them until they flinched. Again, respondent-mother refused to acknowledge that such actions were inappropriate. She also verbally abused her two older daughters—JMH and JMR—referring to them as "tramps" and calling them "fat and ugly." Respondent-mother also left a voicemail to JMH that could be interpreted as a threat to kill JMH. Lastly, as the case progressed, respondent-mother was less consistent with her visitation. At the time of the termination hearing, respondent-mother had missed 53 of the 90 visits she had scheduled with all of her children. Accordingly, the record plainly supports that respondent-mother's issues with parenting still existed at the time of termination. Thus, the trial court did not clearly err in finding that clear and convincing evidence supported that "[t]he conditions that led to the adjudication continue[d] to exist" at the time of termination. MCL 712A.19b(3)(c)(*i*).

### 3. RESPONDENT-FATHER MAXWELL

Respondent-father Maxwell's issues that led to adjudication were similar to those of respondent-mother. Specifically, he was not able to provide proper care and custody of the children because of his lack of income and housing, substance abuse, and poor parenting skills. Respondent-father Maxwell was ordered to participate in the same services as respondent-mother to remedy those problems. He was equally unsuccessful. At the time of termination, respondent-father Maxwell had never provided any proof of a legal income. Further, he was living in an apartment that was too small for all of his children, a problem he had been aware of for several months before termination but did not remedy.

Respondent-father Maxwell also continued to struggle with substance abuse, despite participating in substance abuse counseling. The record reveals that respondent-father Maxwell missed 121 random drug screens over the course of the proceedings, which were automatically counted as positive screens. He also screened positive for marijuana use on multiple occasions. At the time of the termination hearing, he had not participated in a random screen in months. While respondent-father Maxwell alleges on appeal that he only ever tested positive for marijuana and there was no evidence that his use of it inhibited his parenting ability, he fails to address the 121 missed screens. Thus, the record supports the conclusion that respondent-father Maxwell still suffered with substance abuse at the time of termination.

Regardless, respondent-father Maxwell's parenting was inappropriate. Respondent-father Maxwell completed his parenting classes, but it is clear from the record that he did not benefit from those classes. He argues that the trial court wrongfully relied on respondent-mother's improper parenting techniques, physical discipline, and verbal abuse to account for his poor parenting. The record establishes otherwise. Specifically, testimony showed that respondent-father Maxwell grabbed JMH roughly by the arm during an altercation between respondent-mother and the maternal great-aunt. This left a mark on JMH's arm, and a foster care worker testified that respondent-father Maxwell did not grab JMH in an attempt "to protect her from anyone." Furthermore, the foster care worker testified that respondent-father Maxwell whispered threats to his children after he and respondent-mother had been redirected from using corporal punishment. When he was confronted by the foster care worker regarding respondent-mother's use of physical discipline, respondent-father Maxwell supported her, stating that physical discipline she employed would be used in their household. Respondent-father Maxwell failed to show any improvement in his parenting ability and, moreover, he also showed a lack of interest in his children. The record revealed that he had missed 63 of the previous 93 offered parenting-time visits with JVR, AKLR, and ASJR. Respondent-father Maxwell also failed to participate in family therapy. Thus, the record supported that respondent-father Maxwell was still unable to properly parent his children at the time of termination. Consequently, the trial court did not clearly err in finding that clear and convincing evidence supported that respondent-father Maxwell's "conditions that led to the adjudication continue[d] to exist" at the time of termination. MCL 712A.19b(3)(c)(*i*).

## 4. RECTIFICATION OF CONDITIONS

The last step in the analysis under subsection (c)(*i*) requires proof that "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(*i*). All three parents make the same argument with regard to this issue: they should have been given more time, especially considering the pending guardianships, to prove that they could rectify the conditions that led to adjudication. They are incorrect. Respondent-mother was provided nearly four years of services, only a small portion of which took place during the proposed guardianship. Respondent-father Morgan was provided more than three years to rectify the conditions that led to adjudication and respondent-father Maxwell was provided $2^1/_2$ years. As discussed, they showed no improvement in the areas in question. Moreover, they showed either no ability or no desire to improve. Even during the portions of the case when everyone was informed that the guardianships were not possible, the respondents showed no improvement in their treatment plans. Specifically, in that time, respondent-father Morgan either failed to visit JMR or visited her unsupervised in violation of the trial court's order, did not have a place to live, and did not have a job. In that same time, respondent-mother failed to attend drug screens, tested positive for cocaine and marijuana, had her visitation suspended because of violence and verbal abuse, lived in inappropriate housing, and did not provide proof of legal income. Similarly, respondent-father Maxwell missed drug screens, missed more parenting-time visits than he attended, had his visits suspended because of improper parenting, lived in an unsuitable home, and did not provide proof of income. As stated earlier, the potential guardianship was not the problem for respondents. Rather, although they had significant time to show improvement, it was their inability to or decision not to participate in and benefit from their treatment plans that prevented them from rectifying the conditions that led to adjudication.

In sum, the trial court did not clearly err in finding that clear and convincing evidence established grounds to terminate respondents' parenting rights under MCL 712A.19b(3)(c)(*i*) because they "failed to demonstrate sufficient compliance with or benefit from those services specifically targeted to address the primary basis for the adjudication in this matter . . . ." *In re Frey*, 297 Mich App at 248. Thus, we need not consider the remaining statutory grounds for termination because clear and convincing evidence of one ground is sufficient. See *In re Brown/Kindle/Muhammad Minors*, 305 Mich App at 635. Nevertheless, we will briefly address subsection (j).

## C. TERMINATION UNDER SUBSECTION (j)

As noted, the trial court also found that MCL 712A.19b(3)(j) was a statutory ground for termination of respondents' parental rights. That decision by the trial court was not clearly erroneous if there was clear and convincing evidence that "[t]here [was] a reasonable likelihood, based on the conduct or capacity of the child[ren]'s parent, that the child[ren] will be harmed if [they are] returned to the home of the parent." MCL 712A.19b(3)(j). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child[ren] will be harmed if returned to the parent's home." *In re White*, 303 Mich App at 711.

As to the three parents, termination under subsection (j) is weakest with regard to respondent-father Morgan. However, because this Court has held that failure to comply with a

service plan is evidence that a child "will be harmed if returned to the parent's home," the trial court did not clearly err in finding that clear and convincing evidence supported that termination was warranted. *In re White*, 303 Mich App at 711. Throughout the proceedings, respondent-father Morgan failed to regularly visit and provide for JMR. At the time of the termination hearing, he did not have a job, did not have a place to live, and had not visited JMR in a significant amount of time—or, if he did visit, he did so in violation of the trial court's order. Considering those facts, the trial court properly inferred that, if JMR were returned to respondent-father Morgan's care, she might quickly end up homeless and without monetary support. This living arrangement undoubtedly would cause JMR harm. Moreover, considering the lengthy period of time respondent-father Morgan had been provided to rectify his issues, he had not done so, and the record provided no proof that he would be able to do so in the future. Consequently, the trial court did not clearly err in finding that there was clear and convincing evidence warranting termination of respondent-father Morgan's parental right under MCL 712A.19b(3)(j).

As to respondent-mother and respondent-father Maxwell, the likelihood of harm to the minor children if returned to their parents' care is clear from the record. First, as discussed throughout this opinion, respondent-mother and respondent-father Maxwell failed to comply with and benefit from their service plans. That was evidence of potential harm upon a return to their care. *In re White*, 303 Mich App at 711. Second, both parents continued to struggle with substance abuse. While both respondent-mother and respondent-father Maxwell direct this Court to the alleged minor effects of their marijuana use on their parenting ability, their substance abuse issues were greater than just marijuana use.[5] Here, respondent-mother and respondent-father Maxwell did not just test positive for marijuana, rather, respondent-mother repeatedly tested positive for cocaine, and both parents missed more than 100 weekly drug screens each. Third, there existed an obvious risk of harm to the minor children during respondent-mother's and respondent-father Maxwell's parenting-time sessions. On multiple occasions, respondent-mother used physical violence, intimidating behavior, and verbal abuse to discipline her children. Respondent-father Maxwell supported respondent-mother's use of these tactics, and he, too, had physically abused JMH, a minor child who was not his daughter, and whispered threats to his children. The trial court correctly held that those behaviors would lead to harm of the minor children should they be returned to respondent-mother or respondent-father Maxwell. MCL 712A.19b(3)(j).

Finally, considering the large amount of time respondent-mother and respondent-father Maxwell were given to show that they would not harm their children if they were returned to their care, and the lack of any evidence of improvement throughout the proceedings, the trial court did not clearly err in finding that it was highly unlikely the conditions would be rectified in a reasonable time. After four years of services for respondent-mother and $2\frac{1}{2}$ years of services for respondent-father Maxwell, the situation had not improved in many instances and had

---

[5] Respondent-mother also notes that she had a medical marijuana card, urging us to look past her use of the drug on that ground. Respondent-mother, however, fails to consider that she did not have a card until April 2018, years after many of her positive screens.

actually worsened in others. Consequently, the trial court did not clearly err in finding that there was clear and convincing evidence warranting termination of respondent-mother and respondent-father Maxwell's parental right under MCL 712A.19b(3)(j).

In sum, the trial court properly terminated respondents' parental rights to their respective children under MCL 712A.19b(3)(c)(*i*) and (j).

## IV. BEST INTERESTS

Respondents argue that the trial court clearly erred in finding that it was in the minor children's best interests to terminate respondents' parental rights to their respective children. We disagree.

### A. STANDARD OF REVIEW

We review a trial court's determination regarding best interests for clear error. *In re White*, 303 Mich App at 713. "A trial court's decision is clearly erroneous 'if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made.' " *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (brackets omitted), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

### B. APPLICABLE LAW AND ANALYSIS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). " 'The focus at the best-interest stage has always been on the child, not the parent.' " *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (brackets omitted), quoting *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733.

In determining whether termination is in the best interests of a minor child, the trial court is permitted to consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, [] the advantages of a foster home over the parent's home . . . the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan." *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64 (citations and quotation marks omitted). "In assessing whether termination of parental rights is in a child's best interests, the trial court should weigh all evidence available to it." *Id*. at 63. In addition, placement with a relative weighs against termination. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). Indeed, "the fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interest." *In re Olive/Metts Minors*, 297 Mich App at 43 (quotation marks and citation omitted).

## 1. RESPONDENT-FATHER MORGAN

Respondent-father Morgan argues that terminating his parental rights was not in JMR's best interests. The trial court properly considered that JMR was placed with a relative, but also noted that she had a need for stability, which after four years in care, could only be satisfied by adoption. To argue against that, respondent-father Morgan asserts that he had a loving bond with JMR, that she wanted to live with him, and that there was no evidence that he ever neglected JMR. The record, however, suggests otherwise.

At the time of the termination hearing, a foster care worker testified that respondent-father Morgan had not visited JMR in a significant amount of time and that JMR was no longer sure whether she wanted to live with him. Moreover, the record is also clear that respondent-father Morgan did neglect JMR throughout the proceedings, often going months at a time without contacting her. In any event, JMR's need for stability and permanency could not have been met by respondent-father Morgan at the time of termination because he did not have a place to live or a source of income to provide her with the necessary stability and permanency. Thus, the trial court did not clearly err in determining that termination of respondent-father Morgan's parental rights was in JMR's best interests. *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64.

## 2. RESPONDENT-MOTHER AND RESPONDENT-FATHER MAXWELL

Respondent-mother and respondent-father Maxwell argue that it was not in the minor children's best interests to terminate their parental rights. With respect to respondent-mother, at the time of termination, after four years of receiving services and having the opportunity to improve, she still did not have suitable housing or proof of a legal source of income. Further, she continued to struggle with substance abuse as evidenced by more than 150 missed screens and a significant amount of positive tests for cocaine. She also exhibited poor parenting skills by using physical discipline, verbally abusing her daughters, using intimidation to make her children obey, and refusing to try and change those behaviors. Respondent-mother also left JHM a voicemail that threatened her life. Respondent-mother's children had been in DHHS care for an extensive amount of time, during which respondent-mother showed no sign of any ability or desire to improve her parenting skills and housing situation. The trial court properly observed that two children, JMH and JMR, were placed with a relative, but that such placement was not enough to overcome the significant evidence that termination of respondent-mother's parental rights would be in all of the children's best interests. Given the length of time the children spent under the care of DHHS, and their great need for permanency and stability, the trial court did not clearly err in finding that termination of respondent-mother's parental rights was in the best interests of JMH, JMR, JVR, AKLR, and ASJR. *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64; *In re LaFrance*, 306 Mich App at 732-733.

As to respondent-father Maxwell, even after receiving services for $2^1/_2$ years, he failed to show improvement. At the time of termination, respondent-father Maxwell still did not have appropriate housing, did not have a legal income, and struggled with substance abuse—having missed more than 100 random screens. He also exhibited poor parenting skills—supporting respondent-mother's use of physical violence and intimidation as forms of punishment, whispering threats to his children, and grabbing JMH by the arm with such force that he left a

mark. Respondent-father Maxwell failed to improve his parenting skills and issues with substance abuse even after completing parenting classes and attending years of substance abuse counseling. JVR and AKLR waited for four years, and ASJR waited for more than three years, for respondent-father Maxwell to claim his parentage over them and to prove that he could be an appropriate and stable parent. He could not do so, and the trial court properly determined that his children deserved a chance for permanency elsewhere. Their best chance for that was through termination of his parental rights and then adoption—whether by a family member or otherwise. Those conclusions by the trial court were not clearly erroneous. *In re Payne/Pumphrey/Fortson Minors*, 311 Mich App at 63-64.

Respondent-father Maxwell claims that the trial court failed to consider that he had a bond with his children and never abused or neglected them. Further, he argues that the trial court failed to consider the best interests of each child separately and whether guardianship was appropriate for each child individually. As is clear from the record, the trial court did consider a guardianship for each child and determined that, by policy, a guardianship was not appropriate for any of the children. Additionally, the trial court's order terminating respondent-father Maxwell's parental rights specifically addresses the best interests of each child individually. As to respondent-father Maxwell's alleged bond with the children, a foster care worker provided specific testimony that, while respondent-father Maxwell initially had a bond with his children, it had been significantly diminished over the course of the case as respondent-father Maxwell missed 63 of the 93 visits he was offered. Finally, the record does not support respondent-father Maxwell's claim that he never neglected or abused his children. Instead, the record shows that respondent-father Maxwell rarely visited the children, did not provide for them, did not have an appropriate place for them to live, and did not have income to support them. The record also showed that respondent-father Maxwell grabbed JMH with such strength that he left a mark on her arm, that he supported respondent-mother's physical discipline of their children, and whispered threats to his own children. From that evidence, even though JMH was not his daughter, there was a basis for the trial court to infer that respondent-father Maxwell would abuse his children if they were returned to him. Thus, respondent-father Maxwell's arguments in this regard are without merit.

In sum, the trial court did not clearly err when it found that the preponderance of the evidence supports that termination of respondents' parental rights was in the best interests of their respective children.

Affirmed.

/s/ Jane M. Beckering
/s/ David H. Sawyer
/s/ Thomas C. Cameron

-15-